J-S50005-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: L.A.L.P., A MINOR

APPEAL OF: A.P., MOTHER

IN THE SUPERIOR COURT OF PENNSYLVANIA

No. 687 EDA 2017

Appeal from the Order Entered January 25, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s). CP-51-AP-0001302-2016
CP-51-DP-0002009-2012

BEFORE: PANELLA, J., MOULTON, and RANSOM, J.

MEMORANDUM BY PANELLA, J.                    **FILED AUGUST 31, 2017**

A.P. ("Mother") appeals the order of the Court of Common Pleas of Philadelphia County, which changed the permanency goal of her minor daughter, L.A.L.P. ("Child"), born in April 2009, to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351 et seq., and appeals from the decree, which involuntarily terminated her parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b). We affirm.[1]

Child, who has profound medical challenges, has not been in Mother's care since March 27, 2014. Mother, among other deficiencies, has dismally failed in her service goals; she has failed to attend the vast majority of her supervised visits; she has failed to obtain employment; she has failed to obtain suitable housing; and she has not acquired the specialized medical

---

[1] The appointment of separate, independent legal counsel for Child was unnecessary, as there was no conflict between Child's best interest and her legal interest. ***See In re Adoption of L.B.M.***, 161 A.3d 172 (Pa. 2017); ***In re K.M.***, 53 A.3d 781 (Pa. Super. 2012).

training necessary to care for Child. Two DHS social workers testified to the strong bond Child has with foster mother. For instance, Ms. Rossberg attributed the tremendous progress Child has made to the effect of the bond she has with her foster mother. And Ms. Monty testified Child would suffer irreparable harm if she were removed from the foster mother's care because she has been with the foster mother for more than three years and has a bond with foster mother and the foster mother's family. She further noted Child would suffer no irreparable harm if Mother's parental rights were terminated. Child is thriving with her foster mother.

For a recitation of the complete factual background and procedural history of this case, we refer the reader to the trial court's comprehensive opinion of April 11, 2017. *See* Trial Court Opinion, 4/11/17, at 1-8.

Mother raises the following questions on appeal:

1. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights under 23 Pa. C.S. §2511(a), where [DHS] failed to prove by clear and convincing evidence that [M]other was unfit or unwilling to parent [the c]hildren?

2. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights under 23 Pa. C.S. §2511(a) and (b), where [DHS] failed to prove by clear and convincing evidence that involuntarily terminating [Mother's] parental rights would best serve the emotional needs and welfare of [Child]?

3. Did the trial court commit an error of law and abuse of discretion by changing the permanency goal of [Child] from reunification to adoption where [DHS] failed to provide sufficient evidence that such a goal change would be best suited for [Child's] needs and welfare?

Mother's Brief, at 3.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

> [T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (internal citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***See In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained that

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id***. (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). We may affirm the trial court's decision regarding the termination of parental rights with regard to any *one* subsection of § 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will focus, as did the trial court in its opinion, on the trial court's conclusion that termination was appropriate under subsection (a)(8), which provides as follows:

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

> **§ 2511. Grounds for involuntary termination**
>
> > **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
> >
> >        ***
> >
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more

have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

We next turn to subsection (b):

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

This Court has stated that the focus in terminating parental rights under § 2511(a) is on the *parent*, but it is on the *child* pursuant to subsection (b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*).

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated that

if the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's

- 5 -

"needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d at 1121 (internal citations omitted).

"[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). "[W]e will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

Lastly, we consider Mother's issue regarding the permanency goal change. We are guided by the following:

In cases involving a court's order changing the placement goal ... to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court

- 6 -

disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Furthermore, the

[p]lacement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S.A. §§ 6301-6365], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

At each review hearing for a dependent child who has been removed from the parental home, the court must consider the following, statutorily-mandated factors:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

- 7 -

*In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006) (citations and footnotes omitted).

We have carefully reviewed the record and the briefs filed in this matter. There is competent evidence in the record to support the court's conclusion that Mother made grossly insufficient progress toward alleviating the circumstances that necessitated Child's original placement. Accordingly, we agree with the court's determination that Child's best interests are served by changing the permanency placement goal from reunification to adoption and involuntarily terminating Mother's parental rights. And we discern no abuse of discretion on the part of the court in so ordering.

We affirm based on the comprehensive and well-written decision of the trial court. *See* Trial Court Opinion, 4/11/17, at 8-17.

Order and Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/31/2017

**IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION**

| | | |
|---|---|---|
| In the Interest of L. A. L. P., a minor | : | **CP-51-DP-0002009-2012** |
| | : | **CP-51-AP-0001302-2016** |
| | : | |
| | : | **51-FN-002972-2012** |
| | : | |
| APPEAL of: A.P., Mother | : | **687 EDA 2017** |

**OPINION**

**Fernandes, J.:**

Appellant A.P. ("Mother") appeals from the order entered on January 25, 2017, granting the petition filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Mother's parental rights to L.A.L.P. ("Child") pursuant to the Adoption Act, 23 Pa. C. S. A. §2511(a)(2), (5), (8), and (b). Elizabeth Larin, Esq., counsel for Mother, filed a timely Notice of Appeal with a Statement of Matter Complained of on Appeal pursuant to Rule 1925(b).

**Factual and Procedural Background:**

The family in this case became known to DHS on May 9, 2012, when Child, then one year old, was hospitalized for a seizure as a result of not receiving her medicine. On May 10, 2012, DHS received a General Protective Services ("GPS") reports alleging that Child had a quarter-sized bruise on each of her legs; that the bruise was located midway between her knee and the top of her thigh; that it was unknown how these injuries occurred; that Mother reported that she did not know about the bruises and therefore could not explain how they occurred; that the night nurse bathed Child and got her ready for school; that Child wore diapers, so it was unknown how no one noticed the bruises when changing her diaper; that child had a host of medical diagnoses; that Child was non-verbal and could only say words like "no" and "mommy;" that Child had developmental delays; that Child could crawl but needed assistance walking; that Child had a feeding tube and a cleft palate repair; and that Child's sibling was healthy and developmentally on target. The report also alleged that Mother resided with Child's maternal aunt and maternal uncles. The report further alleged that that there were past concerns regarding Mother's missing medical appointments for Child and not providing the daycare staff with Child's medical supplies. The report was found to

be valid. The Community Umbrella Agency ("CUA") Jewish Family and Children's Services ("JFCS") caseworker testified that when Child first came into care, Child was unable to walk or talk and there was not a great hope that Child would ever be able to walk or talk. (N.T. 1/25/17, pg. 53). In September 17, 2012, the home was infested with bed bugs and the home needed to be fumigated. The family had been receiving In-Home Protective Services ("IHPS") through Turning Points since August 2012. However, the family was not compliant. On November 5, 2012, DHS filed a dependency petition for Child. On November 14, 2012, Child was adjudicated dependent. The court ordered that Child remain in the custody of Mother. The court found that IHPS had been implemented, and that Child was receiving services through the Children's Hospital of Philadelphia ("CHOP") Genetic Clinic. The court ordered that DHS supervise; that Mother be referred to Behavioral Health Services ("BHS") for consultation and evaluation; that Mother ensure Child made all medical visits and that she receive all appropriate medication; and that Mother comply with all Family Safety Plan ("FSP") objectives, services, and recommendations. At a February 2013 permanency hearing, the court found that Mother was substantially compliant with the permanency plan. The court ordered that Mother be referred to BHS; that a Family Group Decision Making meeting occur; that Mother continue to attend and schedule all Child's medical appointments; that Mother ensure Child's medication is filled and Child receives medication; that the case be relisted if there were any issues with the in-home nursing staff; and that Mother sign releases. At a July 2013 permanency hearing, the court ordered that court supervision be terminated and found that Mother was in full compliance. On February 24, 2014, DHS received a GPS report alleging that the daily needs of Child's sibling were not being met; that Child had special needs; that Child was diagnosed with cerebral palsy, had a history of seizures, and had a gastrostomy tube ("G-tube") for feeding; that Child was enrolled in medical daycare; and that Child and her sibling appeared clean and hygienically appropriate. The report was found to be valid. On March 27, 2014, DHS observed a bruise on Child's right inner thigh and learned that Child also had bruises on her buttocks. Mother indicated that she observed the injury at the same time DHS did and could not offer an explanation of how the bruise might have occurred, though the night nurse had made Mother aware of the bruises before putting Child in the van for daycare. Child did not appear to be in any pain or impairment as a result of the injury. On March 27, 2014, that same day, DHS obtained an Order of Protective Custody ("OPC") for Child and placed her in

a medical foster home at Episcopal Community Services, now known as JFCS, where she currently resides.[1]

At the shelter care hearing on March 28, 2014, the Court lifted the OPC and ordered that temporary commitment to DHS stand. The April 8, 2014, adjudication hearing was continued and the court ordered that Mother have liberal visits with Child at daycare, as arranged by all parties. The May 12, 2014, adjudicatory hearing was also continued. Child and Child's sibling were adjudicated dependent on June 16, 2014. The court ordered that Child remain in foster care; that Mother be granted weekly visits with Child; that DHS refer Mother for a Parenting Capacity Evaluation; that Mother be referred for medical training; that DHS refer Mother for parenting classes; that the agency ensure that Mother attend all medical appointments; and that Mother be referred to BHS for consultation and evaluation. At a September 2014 permanency review, the court found that Mother was fully compliant with the permanency plan. The court ordered that Mother would be granted two-hour supervised visits with Child at a specialized daycare; that visitation may be modified before the next court date upon agreement; that Mother continue to comply with her FSP objectives, services, and recommendations; and that Mother be referred for a Parenting Capacity Evaluation forthwith. At a December 2014 permanency review, the court ordered that Mother have four-hour visits with Child at the agency; BHS to continue monitoring Mother; and that Mother be notified of all medical appointments. The court further ordered, at a March 2015 permanency review, that Mother continue therapy through Vision Quest; that BHS continue monitoring Mother; that supervised visits continue at the agency, but may be modified upon agreement; that Assessment and Treatment Alternatives ("ATA") provide the court with copies of Mother's Parenting Capacity Evaluation; that all recommendations from the evaluation be completed forthwith; and that Mother comply with all services and recommendations. In June 2015, the court found that Mother completed parenting classes. At a September 2015 permanency review, the court found that Mother was substantially compliant with the permanency plan. The court ordered that Mother continue to comply with all services and recommendations; that Mother comply with the second part of the Parenting Capacity Evaluation; that Mother provide her lease to DHS; and the Mother participate in Child's therapy. In December 2015, the court ordered that Mother have visits with Child twice each week, one supervised and one unsupervised; that Mother

---

[1] The Child came back into care for a second time, and has remained in care for thirty-four months. (N.T. 1/25/17, pg. 12).

participate in the scheduling, transportation, and in Child's medical appointments and that Mother participate in an upcoming school meeting for Child. At a March 9, 2016, permanency review, Mother was in full compliance and the court ordered that Mother's visits continue as agreed upon; and that DHS offer Mother voluntary relinquishment of parental rights. In June 2016, the court found that DHS did not file a petition to terminate parental rights because a compelling reason had been documented showing that such filing would serve the needs and welfare of the Child. The court ordered that Mother be referred for an addendum for the Parenting Capacity Evaluation and that DHS explore voluntary relinquishments of parental rights with Mother. At a September 2016 permanency review, the court found that Mother was minimally compliant with the permanency plan and ordered that Mother have twice weekly visits supervised by the agency, but if Mother missed a full week of visits, they would be modified to weekly visits; that Mother allow DHS to do a safety assessment, home assessment, and any clearance updates; and that Mother sign all releases. At all permanency hearings, the trial court found reasonable efforts on the part of DHS. Mother has recently become minimally compliant and has not successfully completed all of her parental objectives. On December 29, 2016, DHS filed petitions to involuntarily terminate Mother's parental rights and change the permanency goal to adoption.

The petition for goal change and termination of parental rights was heard on January 25, 2017. At the time of the termination trial, Child was seven years of age and had spent thirty-four months, almost three years, in the foster care system. (N.T. 1/25/17, pgs. 11-12, 68). Prior to taking testimony, the trial court accepted a stipulation as to service for Mother and granted DHS' Motion for Sequestration. (N.T. 1/25/17, pgs. 5-6). The trial court also gave Mother a final opportunity to sign voluntary relinquishments as provided by DHS; Mother declined. (N.T. 1/25/17, pgs. 7-8).

The current DHS social worker ("CSW")[2] testified that Mother was minimally compliant with her parenting objectives. (N.T. 1/25/17, pg. 42). At the time of the termination trial. Mother's FSP objectives were to attend a Parent Capacity Evaluation, to obtain appropriate housing, to obtain employment, to have visitation with Child, to attend Child's medical appointments, and to attend mental health with Child. (N.T. 1/25/17, pg. 14). The old DHS social worker ("OSW")[3] testified

---

[2] The current DHS social worker was assigned to the case in late November 2016. (N.T. 1/25/17, pg. 39).
[3] The old DHS worker was on the case from March to November of 2016. (N.T. 1/25/17, pg. 16).

that Mother completed the Parental Capacity Evaluation in July of 2016. (N.T. 1/25/17, pgs. 14, 16-17). CSW, who took over the case in November 2016 testified that Mother completed the psychological testing portion of the evaluation, but did not complete the second part of the evaluation. (N.T. 1/25/17, pgs. 38-40). OSW also testified that she still had concerns about Mother's ability to parent Child and her sibling, who also has special needs. (N.T. 1/25/17, pg. 17). CSW testified that she had concerns about Mother's ability to care for Child due to Child's developmental delays and medical needs. (N.T. 1/25/17, pg. 42). Mother was referred to medical training for Child's special needs, but OSW was unable to reach Mother on at least four attempts. (N.T. 1/25/17, pgs. 18-19). The agency social worker ("ASW")[4] testified that Mother is trained in administering the feeding tube to Child and does so during visits. (N.T. 1/25/17, pg. 74).

Mother was referred to the Achieving Reunification Center ("ARC") for employment, but did not attend. Mother did not find employment during the life of the case. (N.T. 1/25/17, pg. 19). Mother was referred to ARC for housing, but did not complete the housing workshop. (N.T. 1/25/17, pgs. 41-42). OSW testified that there were a lot of unidentified adults in Mother's home when she visited the home, who Mother claimed were just visiting. (N.T. 1/25/17, pgs. 28-29). CSW testified that she was unable to clear Mother's home as Mother only allowed her to see the first floor, while the Child's room was on the second floor. (N.T. 1/25/17, pgs. 40, 41). Mother did not provide CSW a lease, rental license, or mortgage for the home. (N.T. 1/25/17, pg. 41). CSW testified that Mother's home was dirty. (N.T. 1/25/17, pg. 41).

Mother's visits with Child were sporadic. (N.T. 1/25/17, pg. 20). At one time, Mother missed approximately seventeen out of twenty-two visits, though OSW testified that Mother was pregnant and having some issues. (N.T. 1/25/17, pgs. 21, 77). Mother currently has two supervised visits with Child each week. (N.T. 1/25/17, pg. 55). Mother was aware of her visitation schedule. (N.T. 1/25/17, pg. 55). Mother attended thirteen out of her twenty visits. (N.T. 1/25/17, pg. 55). Mother always confirmed the day before visits, but cancelled on the day of the visit due to other appointments that she had. (N.T. 1/25/17, pgs. 55-56, 78). ASW testified that Mother has a history of inconsistent visits. (N.T. 1/25/17, pg. 56). Child did not notice that Mother missed visits. (N.T. 1/25/17, pgs. 56-57). Mother's visitation schedule was modified from one supervised and one

[4] The Child also had a Jewish Family and Children Services agency worker from January 2016 to January 2017. (N.T. 1/25/17, pg. 52).

unsupervised visit each week to two supervised visits each week due to her numerous cancellations. (N.T. 1/25/17, pg. 21). During visits that Mother did attend, Child's behavior regresses and Child becomes more violent towards Mother and Child's siblings because she does not receive as much attention as she wants from Mother. (N.T. 1/25/17, pgs. 58-59). When Mother shows the Child's siblings attention at visits, Child throws a tantrum. (N.T. 1/25/17, pg. 72). The foster mother is usually the one that distracts Child and calms her down from the tantrum. (N.T. 1/25/17, pg. 73). Mother testified that throwing tantrums is a symptom of Child's cerebral palsy. (N.T. 1/25/17, pgs. 102-103). Mother, however, picks up Child, rocks her, and treats her like a baby, allowing Child's misbehavior. (N.T. 1/25/17, pgs. 68-69). Mother admitted that she does not discipline Child during visits, claiming they only have two hours together and she just wants Child to feel happy around her. (N.T. 1/25/17, pg. 103). Mother also testified that she would provide appropriate discipline if Child were in her full-time care. (N.T. 1/25/17, pg. 104).

ASW testified that she observed visits between Mother and Child at Child's doctor's appointments. (N.T. 1/25/17, pgs. 60-61). Some of these appointments were in Mother's home. Mother scheduled these appointments, but the foster mother ensured that Child attended. (N.T. 1/25/17, pgs. 80-81). Mother cancelled visits were when Mother was unable to have Child's appointment in her home. (N.T. 1/25/17, pg. 61). Child's nurse is given the day off when Mother has a scheduled visit, but when Mother cancels, Child is left without a nurse. As a result, Mother's numerous cancellations have caused Child's prior nurses to leave the position. (N.T. 1/25/17, pgs. 63-64). Mother has not missed any of Child's doctor's appointments that took place outside of Mother's home. (N.T. 1/25/17, pg. 74). During the doctor's appointments, Mother interacts with the doctor and nurses, asking questions when needed. (N.T. 1/25/17, pg. 75).

Child receives special services, such as speech therapy, and she has a nurse. (N.T. 1/25/17, pgs. 43, 53). Child is in the first-grade level of special education and receives services in school as well. (N.T. 1/25/17, pg. 47). Child attends an extended year program, which runs for twelve months. (N.T. 1/25/17, pgs. 65-66). Child is currently in a medical foster home through Jewish Family and Child Services. (N.T. 1/25/17, pgs. 12, 22). Child is doing well in the foster home; she talks a lot more and is walking with the assistance of braces. (N.T. 1/25/17, pgs. 22, 52, 54). Child is able to walk long distances by herself and can say a few words, but she comprehends what is said to her. (N.T. 1/25/17, pg. 53). Child is bonded with the foster mother and calls her "Mom."

(N.T. 1/25/17, pgs. 22, 44, 57). ASW testified that Child comes home from school smiling and hugs her foster mother; Child is very comfortable in the foster mother's presence. (N.T. 1/25/17, pg. 57). Child is also bonded with her foster sisters and foster grandmother. (N.T. 1/25/17, pg. 57). The foster mother was attentive at all doctor's appointments, all education, and worked with Child one-on-one to help her progress. (N.T. 1/25/17, pg. 54). ASW testified that Child knows Mother as her mother, but looks to her foster mom for all her needs to be met. (N.T. 1/25/17, pgs. 59-60). The foster mother treats Child as an average seven year old and places her in time out when she misbehaves. (N.T. 1/25/17, pg. 68). ASW testified that Child would likely not receive the full capacity attention from Mother as she needs and currently receives from the foster parents. (N.T. 1/25/17, pg. 58). ASW also testified that Mother is not in a position to parent Child in the way necessary for her developmental age and abilities. (N.T. 1/25/17, pgs. 68-70). As a result, the court heard testimony that changing the permanency goal to adoption is in Child's best interest. (N.T. 1/25/17, pgs. 23, 45, 60). The court heard testimony that Child would suffer from irreparable harm if removed from her current foster home. (N.T. 1/25/17, pgs. 22, 44-45). The court also heard testimony that termination of Mother's parental rights would not cause Child irreparable harm because there is not a positive and healthy maternal relationship between them. (N.T. 1/25/17, pgs. 22-23, 59). All of Child's needs are being met by the foster parents. (N.T. 1/25/17, pg. 46).

At the time of the termination trial, Mother had not successfully completed all of her FSP objectives. Mother completed the testing portion of her Parenting Capacity Evaluation in July 2016, but never met with the clinician to complete the second part. CSW continued to have concerns regarding Mother's ability to parent Child with her special needs. Mother was referred to ARC for employment and housing, though did not attend either. Mother did not obtain employment during the life of the case. Mother has housing, but did not allow DHS to clear the home. Mother's visits with Child were inconsistent and sporadic. Mother once missed seventeen out of twenty-two visits and recently missed seven out of twenty visits with Child. Mother was aware of her visitation schedule and confirmed the day before the visits, but failed to confirm visits on the day of causing a cancellation. Mother treats Child like a baby at visits and not at her age appropriate level, refraining from disciplining Child's misbehavior. Mother has not missed any of Child's medical appointments that take place outside of Mother's home. However, when Mother cancels appointments that were scheduled to be in her home, she causes Child to be without a nurse

for the day. Mother was minimally compliant with her objectives. Mother is unable to take custody and parent the Child. The court found clear and convincing evidence that changing the permanency goal to adoption and involuntarily terminating Mother's parental rights were in Child's best interests. The court also found that Child would not suffer irreparable harm if Mother's parental rights were terminated. Following argument, the trial court then terminated Mother's parental rights under 23 Pa. C. S. A. §2511(a)(2), (5), (8), and (b), and changed the goal to adoption. On February 22, 2017, Mother's attorney filed this appeal on behalf of Mother.

**Discussion:**

Mother avers that the trial court committed an error of law and abuse of discretion by:

1. Involuntarily terminating [Mother's] parental rights under 23 Pa. C.S. § 2511 (a), where [DHS] failed to prove by clear and convincing evidence that mother was unfit or unwilling to parent her children.
2. Involuntarily terminating [Mother's] parental rights under 23 Pa. C.S. § 2511 (a) and (b), where [DHS] failed to prove by clear and convincing evidence that involuntarily terminating [Mother's] parental rights would best serve the emotional needs and welfare of [Child].
3. Changing the permanency goal of [Child] from reunification to adoption where [DHS] failed to provide sufficient evidence that such a goal change would be best suited for [Child's] needs and welfare.

The trial court terminated Mother's parental rights under 23 Pa. C. S. A. §2511(a)(2). This section of the Adoption Act includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect, or refusal of the parent that causes the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being; and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. *Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996).

Child was taken into DHS custody because Mother was unable to provide essential parental care: she was not keeping up with Child's medical needs causing Child to be hospitalized; and Child

had bruises that Mother could not explain. Child is medically needy. Child was returned to Mother in July 2013. On March 27, 2014, Child came back into care for the same reasons as the first time Child came into care. Mother is unable to remedy the causes of her repeated and continued incapacity to provide Child with essential parental care, control, or subsistence necessary for Child's physical and mental well-being. Mother has not successfully completed all of her FSP objectives. (N.T. 1/25/17, pg. 42). Mother's FSP objectives were to attend a Parent Capacity Evaluation, to obtain employment, to obtain appropriate housing, to attend mental health therapy with Child, to have visitation with the Child and to attend Child's medical appointments. (N.T. 1/25/17, pg. 14). Mother completed only the psychological testing portion of the Parent Capacity Evaluation, but did not complete the second part, which is the evaluation. (N.T. 1/25/17, pgs. 38-40). CSW continues to have concerns about Mother's ability to care for Child due Mother's inability to understand Child's needs. (N.T. 1/25/17, pg. 42). Mother was referred to medical training for Child's special medical needs, but Mother did not attend. (N.T. 1/25/17, pgs. 18-19). After numerous attempts, Mother did receive her medical training. (N.T. 1/25/17, pg. 74). Mother was referred to ARC for employment, but did not find employment during the life of the case. (N.T. 1/25/17, pg. 19). Mother was also referred to ARC for housing, but did not attend. Mother claims she has housing, but DHS was unable to clear the house since Mother only allowed CSW to see the first floor when Child's room would be on the second floor. (N.T. 1/25/17, pgs. 40-42). Mother's home has many unidentified adults, who Mother could not identify. Mother claimed the adults were visiting. (N.T. 1/25/17, pgs. 28-29). CSW testified that the house was dirty and that Mother did not submit any documentation verifying her residence in that home. (N.T. 1/25/17, pgs. 40-42). Mother was offered family therapy with the Child, but due to Mother's lack of participation, it was discontinued. (N.T. 1/25/17, pg. 70). Mother has more recently shown interest in re-engaging in family therapy with Child, but the appointments have not yet begun. (N.T. 1/25/17, pgs. 70-71). Mother's visits with Child were inconsistent and sporadic. (N.T. 1/25/17, pgs. 20, 55-56). At one time, Mother missed approximately seventeen out of twenty-two visits, not including visits she missed due to her pregnancy complications. (N.T. 1/25/17, pgs. 21, 77-78). Mother at one point had one supervised and one unsupervised visit with Child each week, but her visits were modified to two supervised visits weekly due to her missing numerous visits. (N.T. 1/25/17, pg. 21). When Mother did attend visits with Child, Child's behavior regressed and she became more violent towards her Mother and her siblings. (N.T. 1/25/17, pgs. 58-59). Child

throws tantrums to get Mother's attention, after which she reaches for Mother to pick her up and rock her. (N.T. 1/25/17, pgs. 68-69, 72-73). Mother admitted that she does not discipline Child when she misbehaves, claiming they only have two hours together. Mother wants the Child to feel happy around her. Mother is unable to appropriately control the Child's behavior. (N.T. 1/25/17, pg. 103). Mother does attend Child's medical appointments. However, Mother often cancels appointments scheduled to be held in her home. (N.T. 1/25/17, pgs. 60-61). When Child has an appointment scheduled, her nurse is given the day off. Child is left without a nurse on those days when Mother cancels appointments. Child has experienced multiple changes in nurses because they leave the position when Mother cancels appointments. The nurses lose the hours which they could have worked. (N.T. 1/25/17, pgs. 63-64). Child needs the nursing services due to her medical needs. Mother usually does not miss any medical appointments that take place outside of the home. (N.T. 1/25/17, pg. 74). Mother seems to interact with the doctors and nurses during any appointments she attends. (N.T. 1/25/17, pg. 75). Mother failed to take affirmative steps to place herself in a position to parent Child. Child needs permanency, which Mother cannot provide. Mother is unable to meet the Child's needs necessary for the Child's developmental age and abilities. (N.T. 1/25/17, pgs. 68-70). Therefore, DHS met its burden under §2511(a)(2) of the Adoption Act and termination under this section was proper.

Mother also appeals the trial court's termination of parental rights under 23 Pa. C. S. A. §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond a period of time deemed reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts have been made by the agency, which have been

ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 508 (Pa. Super. 2004).

Child has been in DHS custody since March 27, 2014, for a total of thirty-four months, almost three years. After being returned to Mother, the Child came back into care nine months later. Child was placed in foster care because Mother was unable to parent and provide for the Child's medical needs. Mother's chief obstacle to reunification was her failure to successfully complete all of her FSP objectives and comprehend the Child's medical needs. Mother's FSP objectives were to attend a Parenting Capacity Evaluation, to obtain employment, to obtain appropriate housing, to attend mental health with Child, to visit with the Child consistently, and to attend Child's medical appointments. (N.T. 1/25/17, pg. 14). Mother did not complete her Parenting Capacity Evaluation; she only completed the testing portion and did not complete the second part of the evaluation. (N.T. 1/25/17, pgs. 14, 16-17, 38-40). The DHS social workers both expressed ongoing concerns about Mother's ability to care for Child due to her developmental delays and special medical needs. (N.T. 1/25/17, pgs. 17, 42). Mother was referred to medical training for Child's special medical needs, but did not attend after numerous attempts to contact Mother. (N.T. 1/25/17, pgs. 18-19). Mother finally was trained in administering the feeding tube to Child. (N.T. 1/25/17, pg. 74). Mother was referred to ARC for employment and housing, but did not attend either program. (N.T. 1/25/17, pg. 19). Mother did not have employment during the life of the case. (N.T. 1/25/17, pg. 19). DHS was unable to clear Mother's home because she only allowed CSW to view the first floor when Child's bedroom was on the second floor. (N.T. 1/25/17, pgs. 40-41). Mother had many unidentified adults in the home, claiming they were visiting. (N.T. 1/25/17, pgs. 28-29). CSW testified that the home was dirty. (N.T. 1/25/17, pg. 41). Mother also did not provide documentation verifying her residence at the house. (N.T. 1/25/17, pg. 41). Mother does not have suitable housing for Child. Mother was offered family therapy with Child, but due to Mother's non-participation, it was discontinued. (N.T. 1/25/17, pg. 70). Mother has recently shown interest in re-engaging in family therapy with Child, but the therapy has not yet started. (N.T. 1/25/17, pgs. 70-71). Mother has a history of inconsistent and sporadic visits. (N.T. 1/25/17, pgs. 20, 55-56). At one time, Mother missed seventeen out of twenty-two visits. (21, 77-78). Recently, Mother missed seven out of twenty visits. (N.T. 1/25/17, pg. 55). ASW testified that the few visits missed due to her pregnancy were not counted against Mother. (N.T. 1/25/17, pgs. 77-78). Mother's cancelled visits were due to other appointments that Mother had that day.

(N.T. 1/25/17, pgs. 55-56, 78). Due to the numerous cancelled visits, Mother's visitation schedule was modified from one supervised and one unsupervised visit each week to two supervised visits each week. (N.T. 1/25/17, pg. 21). Child threw tantrums at visits to gain Mother's attention whenever Mother showed her attention towards other siblings. (N.T. 1/25/17, pg. 72). Mother testified that the tantrums are part of Child's cerebral palsy symptoms and does not believe in controlling the Child's behavior. (N.T. 1/25/17, pgs. 102-103, 68-69). The foster parent usually has to distract Child and calm her down from the tantrum or agitation. (N.T. 1/25/17, pg. 73). Mother wants Child to feel happy around her. (N.T. 1/25/17, pg. 103). Mother schedules Child's doctor's appointments and foster mother ensures that Child attends those appointments. (N.T. 1/25/17, pgs. 80-81). However, Mother often cancels appointments that are scheduled to be held in Mother's home. (N.T. 1/25/17, pg. 61). These cancellations have caused Child to be without a nurse on those days and to experience multiple changes and instability in nursing services. (N.T. 1/25/17, pgs. 63-64). Mother usually does not miss any appointments scheduled outside of her home and regularly engages with Child's doctors and nurses during the appointments. (N.T. 1/25/17, pg. 75). Throughout the life of the case, the trial court always found that DHS made reasonable efforts to reunify Child with Mother. The trial court also found that Mother was not able to remedy the conditions which led to Child's placement within a reasonable amount of time as evidenced by Mother's failure to successfully complete all of her FSP objectives. Child is currently placed in a medical foster home where the foster parent takes care of all of Child's needs. (N.T. 1/25/17, pgs. 12, 22, 46-47). Child has a positive relationship with foster mother, who treats Child like the seven year old that she is, and calls the foster mother "Mom." Child looks to the foster mother for all her needs to be met. (N.T. 1/25/17, pgs. 59-60). Child is also bonded with her foster siblings and even her foster grandmother. (N.T. 1/25/17, pg. 57). The court heard testimony that Child would suffer irreparable harm if removed from the foster mother's care. (N.T. 1/25/17, pgs. 22, 44-45). Mother was given ample time to place herself in a position to parent Child. Child cannot wait for Mother to decide when to be a parent. The conditions which led to the placement of Child continue to exist, and Mother cannot and will not remedy them within a reasonable amount of time. As a result, the trial court found that termination of Mother's parental rights would be in the best interest of Child's physical, intellectual, and emotional well-being. The trial court made this determination on the basis of clear and convincing evidence, so termination under this section was also proper.

The trial court also terminated Mother's parental rights under 23 Pa. C. S. A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 938 A.2d 1128, 1133 (Pa. Super. 2009). The party seeking termination must also prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love and comfort, security and stability. *In re Bowman*, A.2d 217 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

Child has been in DHS custody since March 27, 2014, almost three years since removed from Mother because Mother was unable to parent. This is the second time Child is in care. Mother has not successfully completed all of her FSP objectives and has not placed herself in a position to parent Child. The Child is a medically needy child. Mother's outstanding FSP objectives were to attend a Parenting Capacity Evaluation, to obtain employment, to obtain appropriate housing, to attend family therapy with Child, to visit with the Child consistently, and to attend Child's medical appointments. (N.T. 1/25/17, pg. 14). Mother only completed the testing portion of the Parenting Capacity Evaluation and did not complete the second part of the evaluation. (N.T. 1/25/17, pgs. 14, 16-17, 38-40). The DHS social workers continue to have concerns about Mother's ability to parent Child given Child's developmental delays and Child's other siblings, at least one of which also has developmental delays. (N.T. 1/25/17, pgs. 17, 42). Mother was referred to medical training for Child's special medical needs, but did not attend. (N.T. 1/25/17, pgs. 18-19). Mother is now trained in administering Child's feeding tube, and does so during supervised visits. (N.T. 1/25/17, pg. 74). Mother was referred to ARC for employment and housing, though she did not complete either. (N.T. 1/25/17, pgs. 19, 41-42). Mother did not obtain any employment during the life of the case. (N.T. 1/25/17, pg. 19). Mother only allowed CSW to view the first floor of

the home when Child's bedroom was on the second, so DHS was unable to clear the home. Mother has a copy of a lease to verify her residence. (N.T. 1/25/17, pg. 41). Many individuals are in the home, who Mother claims are visiting. (N.T. 1/25/17, pgs. 28-29). Mother was to do family therapy with Child, but it was discontinued due to Mother's lack of participation. (N.T. 1/25/17, pg. 70). Mother has recently shown interest in re-engaging with family therapy, but therapy has not yet started. (N.T. 1/25/17, pgs. 70-71). Mother has a history of inconsistent and sporadic visits with the Child. (N.T. 1/25/17, pg. 20, 56). Visits missed due to Mother's pregnancy were not counted against her. (N.T. 1/25/17, pgs. 77-78). Still, Mother missed seventeen visits out of twenty-two at one time, and recently missed seven out of twenty visits with Child. (N.T. 1/25/17, pgs. 21, 55, 77). When Mother did attend visits, Child threw tantrums, acting baby-like and even violent, to attract Mother's complete attention, to which Mother admitted acquiescing to rather than controlling Child's behavior. Mother wants Child to be happy around her. (N.T. 1/25/17, pgs. 58-59, 72, 68-69, 103). Child doctor's appointments were sometimes scheduled in Mother's home, though Mother would cancel at the last minute. (N.T. 1/25/17, pg. 61). This would cause Child to be without a nurse for the day, since they were given appointment days off, and to experience instability in nursing services because the nurses would get upset when they learned they could have worked that day after all. (N.T. 1/25/17, pgs. 63-64). Termination of Mother's parental rights were in Child's best interests. (N.T. 1/25/17, pg. 23, 45, 60, 67-68). Child has been in care for almost three years and needs permanency. Child is currently placed in a medical foster home where foster mother meets all of Child's needs. (N.T. 1/25/17, pgs. 12, 22, 46-47, 59-60). Child calls foster mother "Mom," and looks to her for all of her needs to be met. (N.T. 1/25/17, pgs. 59-60). The Child is bonded with the foster mother and the foster siblings. The court heard testimony that Child would suffer irreparable harm if removed from the foster mother's care. (N.T. 1/25/17, pgs. 22, 44-45, 57). The conditions that led to Child's removal from Mother's care continue to exist as Mother failed to successfully complete all of her FSP objectives. The testimony of the DHS witnesses were unwavering and credible. Mother is not ready or able to parent Child with all of her medical needs. As the record contains clear and convincing evidence that termination was in the best interests of Child, the trial court did not abuse its discretion and termination under this section was proper. (N.T. 1/25/17, pgs. 23, 45, 60).

After a finding of any grounds for termination under section (a), the court must, under 23 Pa. C. S. A. §2511(b), also consider what – if any – bond exists between parent and child. *In re*

*Involuntary Termination of C.W.S.M. and K.A.L.M.*, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *Id.* At 762-763. However, under 23 Pa. C. S. A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical, if found to be beyond the control of the parent.

Mother was sporadic and inconsistent with her visits with Child. (N.T. 1/25/17, pgs. 20, 55-56). Mother recently missed seven out of twenty visits and previously missed seventeen out of twenty-two visits with Child. (N.T. 1/25/17, pgs. 21, 77, 78). Child did not even notice when Mother missed visits. (N.T. 1/25/17, pgs. 56-57). Mother also has the opportunity to visit with Child when attending the Child's medical appointments in the foster home. Child is a medically needy child and needs full-time nursing care. However, Mother cancels the appointments, depriving herself of additional visiting time. (N.T. 1/25/17, pgs. 60-64). Child regresses in her behavior, throwing tantrums and becoming aggressive, when Mother moves her attention away from Child to Child's other siblings during visits. (N.T. 1/25/17, pgs. 58-59, 72). Mother also treats Child like a baby during visits, holding and rocking her, and does not discipline Child for her behavior. Mother wants the Child to feel happy around her. Mother is unable to appropriately control Child's behavior. (N.T. 1/25/17, pgs. 68-69, 103). The foster mother is usually the one that distracts Child and calms her down from the tantrum. (N.T. 1/25/17, pg. 73). Child looks to her foster mother for all of her needs to be met and calls the foster mother, "Mom." (N.T. 1/25/17, pgs. 22, 44, 57, 59-60). Child is very comfortable around the foster mother and is even bonded with the rest of her foster family. (N.T. 1/25/17, pgs. 57). The foster mother is attentive to all of Child's educational needs, including working with Child one-on-one to help her development, and Child's medical needs and appointments. (N.T. 1/25/17, pg. 54). Mother has not asked for any of Child's report cards, parent-teacher conferences, or even general school progress updates. (N.T. 1/25/17, pg. 20). The court heard testimony that Mother and Child do not have a maternal, parental, or even a

positive bond. (N.T. 1/25/17, pgs. 22-23, 59). Child is in a safe, permanent, and pre-adoptive home. DHS witnesses were credible. Consequently, the trial court did not abuse its discretion when it found, by clear and convincing evidence, that there was no parental bond and that termination of Mother's parental rights would not destroy an existing beneficial relationship.

Mother also alleges that the court erred in changing Child's permanency goal from reunification to adoption. In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. *In the Interest of R.P. a Minor*, 957 A.2d 1205 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply instructions received. *In re R.T.*, 778 A.2d 670 (Pa. Super. 2001). The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Mother is not currently ready or able to parent Child. At the time of the termination trial, Mother had not successfully completed all of her FSP objectives. Mother only completed half of her Parent Capacity Evaluation and has yet to meet with the clinician for the second half. (N.T. 1/25/17, pgs. 14, 16-17, 38-40). The DHS social workers have continued concerns about Mother's ability to parent and care for the Child given Mother's inability to understand the Child's needs. (N.T. 1/25/17, pgs. 17, 42). Mother did not obtain employment during the life of the case. (N.T. 1/25/17, pg. 19). Mother was also ordered to attend a housing program, but did not attend. Mother did not allow a full assessment of her current home. Mother was unable to identify the identities of the numerous people in the home. (N.T. 1/25/17, pgs. 28-29, 40-42). Mother does not have suitable housing and has not made efforts to obtain it. (N.T. 1/25/17, pg. 41). Mother did not engage in family therapy with Child and only recently started showing an interest in re-engaging. (N.T. 1/25/17, pgs. 70-71). Mother was inconsistent with her visits with the Child. (N.T. 1/25/17, pg. 20, 56). Mother missed numerous visits, recently missing seven out of twenty visits, which does not include any visits Mother missed due to her pregnancy. (N.T. 1/25/17, pgs. 21, 55, 77-78). Mother's visits were modified from one unsupervised and one supervised visit each week to two

supervised visits each week due to her missed visits. (N.T. 1/25/17, pg. 21). Child regresses to baby-like behavior when around Mother, and throws tantrums to keep her Mother's attention from her siblings. (N.T. 1/25/17, pgs. 58-59, 72-73). Mother reciprocates and treats Child like a baby, as well, holding and rocking her after a tantrum, rather than controlling the Child's behavior. Mother claims she wants Child to feel happy around her. (N.T. 1/25/17, pgs. 68-69). Mother scheduled Child's medical appointments, though has cancelled many appointments that were scheduled to be held in the home. (N.T. 1/25/17, pgs. 61, 80-81). These cancellations have caused Child to be without a nurse for the whole day. Mother is unable to comprehend Child's medical needs. (N.T. 1/25/17, pgs. 63-64). Child need permanency. Child was reunified with Mother about nine months before returning to care for a second time. Child is in a safe, permanent, and pre-adoptive home. Child looks to the foster parent for all of her needs to be met. (N.T. 1/25/17, pgs. 59-60). The court heard testimony that removal from the foster parent's care would cause Child irreparable harm. (N.T. 1/25/17, pgs. 22, 44-45). Adoption is in Child's best interest. (N.T. 1/25/17, pgs. 23, 45, 60). The record established by clear and convincing evidence that the change of permanency goal from reunification to adoption was proper. The court did not err or abuse its discretion when it changed the goal to adoption.

**Conclusion:**

For the aforementioned reasons, the court properly found that DHS met its statutory burden by clear and convincing evidence regarding termination of Mother's parental rights pursuant to 23 Pa. C. S. A. §2511 (a)(2), (5), (8) and (b) since it would best serve Child's emotional needs and welfare. The court also properly found that changing the Child's permanency goal from reunification to adoption was in Child's best interest. The trial court's termination of Mother's parental rights and change of goal to adoption were proper and should be affirmed.

By the court,

Joseph Fernandes, J.